# H. P. COLEMAN v. S. P. REYNOLDS, Appellant.

**Division One, November 27, 1907.**

1. **MOTIONS IN ANSWER: No Ruling or Exception.** Where no error is predicated in the motions for new trial and in arrest on the trial court's failure to rule upon or otherwise dispose of motions hid away in appellant's answer, that a certain person be made a party plaintiff, etc., such questions cannot be considered on appeal.

2. **REPLEVIN: Rescission of Contract of Sale: Materiality of Question.** If by the uncontradicted evidence the sale of the lumber was for cash on delivery and defendant was not entitled to possession until payment was made (the two acts being concurrent), then, on a showing in the replevin suit that payment was not made, it is not necessary to consider plaintiff's right to the property on the theory that he rescinded the contract of sale for alleged violations thereof by defendant; but absent either of these concurrent acts, then the question of rescission is material.

3. ————: **Cash on Delivery: Evidence: Peremptory Instruction.** Where plaintiff positively testifies that the terms of the oral agreement for the sale of the lumber were cash on delivery on board of cars and that the lumber remained in his possession until paid for, and nowhere in the record is there any contradiction of that testimony, but, on the contrary, there is by indirection and inference cogent testimony, unchallenged, sustaining plaintiff's theory, he is entitled to a peremptory instruction directing the jury to find for him.

4. ——: **Right to Possession: Subsequent Sale: Advanced Payment.** Where the contract for the sale of lumber was for cash on delivery, the title did not pass until payment was made; and where payment was not made, and plaintiff sold it to another, and thereupon the first purchaser brought replevin against the second and the sheriff put the lumber in the possession of the first purchaser, the seller may maintain replevin against him, and is entitled to a peremptory instruction where the evidence is uncontradicted that the sale was for cash on delivery and where plaintiff pays into court for defendant the cash he has advanced in part payment therefor.

5. ——: ——: **Rescission.** And that being the case, the question of plaintiff's right to rescind the contract for defendant's breach thereof, is no longer in the case.

6. ——: ——: ——: **Subsequent Replevin: In Custodia Legis.** If Reynolds sue Hurd, a subsequent purchaser, and get possession of Coleman's lumber, Coleman may institute his independent suit against Reynolds to recover possession of the lumber. Coleman is not required to intermeddle in the first suit and abide its intermediate incidents and final event, or to postpone the recaption of his lumber, until the first suit is out of the way. The property being placed in possession of Reynolds, and not retained by the sheriff, is not *in custodia legis,* and Coleman is entitled to recover it from Reynolds, notwithstanding his previous suit against Hurd is not determined but is still pending.

Appeal from Pemiscot Circuit Court.—*Hon. Henry C. Riley,* Judge.

AFFIRMED.

*Faris & Oliver* for appellant.

Under the facts the title had passed from Coleman to Reynolds. The latter had paid $5.00 per thousand for each thousand feet of lumber as per estimate; he had marked each separate stack in which the 349,200 feet were contained with his initials; he had received a receipt from Coleman, his vendor, containing the stack numbers of the stacks sold and initialed, and he

had taken possession of all of said stacks and was load-ing out the lumber. The segregation from the other lumber was complete. The receipt recites that the lumber in question was "bought of me, H. P. Coleman." It could not be "bought" unless concurrently it was sold. Glass v. Blazer, 91 Mo. App. 564; Kuhler v. Tobin, 61 Mo. App. 576; Keiler v. Tutt, 31 Mo. 301; Gatzweiler v. Morgner, 51 Mo. 47; State to use v. Knapp, 13 Mo. App. 467; Toney v. Goodley, 57 Mo. App. 235; Collins v. Wayne Lumber Co., 128 Mo. 451; Caldwell v. Gar-ner, 31 Mo. 131; Creelman v. DeLisle, 107 Mo. App. 615. There was here such a change of possession and such a notorious continuance of possession as even to satisfy and comply with the statute, if this had been required. Sec. 3410, R. S. 1899. And by the common law, as well as by statute, the title had passed by the sale from Coleman, the plaintiff, to Reynolds, the de-fendant. Rheu v. Reins, 21 Ill. 530; Sutherland v. Brace, 73 Fed. 624. Yet plaintiff was permitted to go to the jury in a replevin case, without having prior thereto demanded a return of the lumber, without re-turning, or tendering the money paid therefor before suit was brought, without having rescinded the con-tract, without proof of fraud in the making of said contract, and without showing the insolvency of his vendee. Lynch v. Bucher, 38 Conn. 490; Woodruff v. Adams, 37 Conn. 233; Cobkey on Replevin, secs. 454, 456, 462; Cole v. Railroad, 21 Mo. App. 443; Smith v. Woodleof, 21 Kan. 717.

*J. R. Brewer* and *Everett Reeves* for respondent.

(1) Coleman is entitled to maintain this action for the reason that at the time of the institution of this suit he was the owner and entitled to the possession of the property in question. For the undisputed testi-mony is that under the contract the title was to remain

207 Sup.—30

in him until the lumber was paid for. Boutell v. Warne, 62 Mo. 350; Bergeman v. Railroad, 104 Mo. 77; Johnson-Brinkman Com. Co. v. Railroad, 126 Mo. 344; Bank v. Tiger Tail Mill & Land Co., 152 Mo. 145; Com. Co. v. Railroad, 72 Mo. App. 437; Johnston v. Parrott & Barnes, 92 Mo. App. 199; Little v. Page, 44 Mo. 412. (2) The facts do not show a change of possession of said lumber from Coleman to Reynolds, as contended by appellant. The marking of the lumber "S. P. R." while the same was on the mill-yard of respondent and in his possession did not constitute a change of possession. Said marking of said lumber, as shown by the testimony, was for the purpose only of determining the amount of money to be advanced on said lumber. Bank v. Tiger Tail Mill & Land Co., supra. (3) No demand for the property in question before the institution of this suit was necessary. The only effect of failure to make demand is that plaintiff should be taxed with the costs of suit, provided the defendant pleads a want of demand. Sec. 1575, R. S. 1899. (4) Coleman was not required to make a tender to Reynolds prior to the institution of this suit, of the amount due said Reynolds upon the contract. Reynolds wrongfully and tortuously took the lumber of Coleman under the writ of replevin sued out by the former against Hurd. Coleman had the right to place himself *in statu quo* by replevin. Bergeman v. Railroad, supra. But if a tender was required, which we deny, then there was a sufficient tender made by Coleman to Reynolds before the institution of this suit. Burt v. Cook, 151 Mo. 416; Stephenson v. Kilpatrick, 166 Mo. 262. (5) The doctrine of *in custodia legis* does not apply in this case, for the reason that Coleman was a stranger to the suit of Reynolds v. Hurd. There is no privity between Hurd and Coleman. The lumber had never been delivered to Hurd by Coleman, and under the contract

between Coleman and Hurd no title passed to the latter. Mohr v. Langan, 162 Mo. 474.

LAMM, J.—Coleman sued Reynolds in replevin in the circuit court of Pemiscot county to recover possession of 256,000 feet of described cottonwood lumber, in part in certain cars and in part in a certain mill yard, and was put in possession under his writ. At the trial judgment went in Coleman's favor and Reynolds appeals here.

No point is made on the petition, which is in conventional form and needs no attention.

The answer was a specific denial of each averment of the petition, except that relating to the value of the lumber. It is alleged, furthermore, that defendant owned the lumber at the time suit was brought and owns it now and is entitled to the possession. The damages for plaintiff's alleged unlawful taking and detention is put at the sum of $3,000, and defendant claims said damages and the return of the lumber. The answer then avers that prior to the institution of the suit at bar defendant, Reynolds, as plaintiff, brought replevin against one Hurd for the same lumber and by the writ in that case was put in possession of it by the sheriff of Pemiscot county; that said prior suit is pending and undisposed of in the circuit court of said county; that said lumber, by the writ issued in said prior suit, came into "the custody of the court as aforesaid, and defendant says that plaintiff herein cannot have and maintain his cause of replevin against said lumber and property for the reason above stated."

Finally, the answer states that "defendant prays that said O. P. Hurd may be by a proper order of court brought in and made a party plaintiff to this action; that said two suits now pending may be consolidated and that upon a proper hearing defendant have judgment as above prayed herein, and for his costs."

The replication was, in effect, a denial of new matter in the answer.

I. If the concluding clause of the answer, by whatsoever benevolent and bland interpretation, be deemed *two motions,* one that Hurd be brought in as a party plaintiff and the other that the two replevin suits be consolidated, yet we find no ruling, *nisi,* on such submerged motions, so hid away in such unexpected place as an answer. We find no disposition of the motions in the abstract, and no error predicated in the motions for new trial and in arrest, on any failure to rule in that behalf. Therefore, such questions become by-matter and out of the case.

II. In 1902 Coleman was a millman, running a saw mill in Pemiscot county and manufacturing lumber. In that year one Stinson appeared on the scene representing Houston Brothers of Cairo, Illinois, and contracted in their name and in their behalf with plaintiff for a lot of lumber—as we infer, "in the stick." At all events, whether in the stick or not, it was not ready for delivery, was roughly estimated at nearly 350,000 feet—the price, $11.75 per 1,000 feet "log run." At a certain time plaintiff entered upon the performance of this contract, and we take it some of the lumber had been inspected by Stinson; but whether this be so or not, plaintiff demanded an advancement to pay his mill hands, and Stinson informed him that Reynolds would advance the money. There was evidence introduced by defendant tending to show that Houston Brothers refused to take the lumber on the terms agreed on, or propositions made to their agent, Stinson, and refused to make any advancement on lumber "in the stick;" that plaintiff was informed of that fact and thereupon entered into a new contract with Reynolds with full knowledge of the fact that he was thereafter dealing with the latter and not with Houston Brothers.

There is, however, evidence introduced by plaintiff (and some phases of it are corroborated by defendant's testimony), that Reynolds at this time was dealing in connection with Houston Brothers; that when Stinson referred plaintiff to Reynolds, plaintiff was allowed to suppose he was still dealing with Houston Brothers and carrying out the deal made with Stinson, and never became aware of the fact that Reynolds claimed to be the owner of the lumber until about the time (or after) the replevin suits were brought. The testimony is exceedingly diffused and confused on this point. Some of the lumber, say sixty-odd thousand feet, was delivered; and some of the testimony indicates that Houston Brothers got one part of that so delivered and that Reynolds got another. Some of the testimony bears the construction that Reynolds got all that was delivered, and that whatever part Houston Brothers got came from Reynolds. But we deem all of this testimony unimportant. It throws no light on the vital question in the case, to-wit, who was entitled to the possession of the lumber in suit when suit was brought? The right answer to that question does not depend upon the time when plaintiff became aware of the fact that Reynolds claimed the lumber and was paying for it out of his own funds. It sufficiently appears that Reynolds and plaintiff entered into a new arrangement, as plaintiff supposed, on behalf of Houston Brothers, and as Reynolds contends, on his own behalf; and the record substantially shows that it was on Reynolds' behalf alone. This arrangement was made because there was a squabble between Stinson and plaintiff about the terms of the original contract, which squabble arose after Stinson began inspecting the lumber ostensibly for his principals, the Houston Brothers. Be that as it may, it appears, as said, that Stinson sent plaintiff to Reynolds to receive a demanded advancement, that Reynolds advanced him $500 of his own

money, and thereafter in two other installments advanced him enough more to make up the sum of $1,746 at $5 per 1,000 feet on the estimated amount of lumber covered by the contract—leaving $6.75 per 1,000 feet back.

The case was put to the jury on two theories by plaintiff's instructions. The first theory was based on the terms of the new arrangement finally entered into between plaintiff and defendant. It involves the question whether the title and right to possession remained in plaintiff under the terms of the contract until the lumber was paid for by defendant. The second theory is based on the notion of a rescission of the contract by plaintiff; and this theory involves a consideration of the facts uncovered at the trial relating to alleged violations of the contract by Reynolds and his agent, one Bostick, upon which facts plaintiff builds a contention that he was entitled to rescind and did rescind.

It stands admitted in the case that the lumber was not paid for in full by defendant. It stands admitted defendant never tendered such payment. If, therefore, it be determined by the *uncontradicted* testimony that under the contract the sale was cash on delivery, that defendant was not entitled to possession until payment was made (the two acts being concurrent), and that the title was to remain in plaintiff until such time, then we need not consider the second theory nor the instructions on either side relating to that theory because error in the giving or refusing of such instructions could not be error materially affecting the merits of the case. If, however, there was any substantial evidence in the case that the terms of the sale did not include cash on delivery, and that the title was not to remain in plaintiff until the lumber was paid for; and if the facts tend to show that under the contract the defendant was entitled to and in rightful possession of the lumber at the institution of the suit (unless the con-

tract was rescinded) then the question of rescission is reached, the instructions pro and con on that question become material and the assignment of errors relating to such instructions is here for consideration.

Attending to the contract between plaintiff and defendant the record shows this condition of things: The new arrangement between plaintiff and defendant was built on the old arrangement made by Stinson with plaintiff for Houston Brothers. Some of the terms contemplated by the old arrangement were not changed, and some of them were. Among the terms remaining unchanged were those relating to delivery and to the possession of and title to the lumber. Two witnesses testified about the old agreement (an oral one)—plaintiff and said Stinson. Plaintiff testified the arrangement was that "the lumber became his [referring to Stinson as representative of Houston Brothers] when it was was put aboard the cars, when it was put on the cars and paid for by him." Referring to the new arrangement with Reynolds the plaintiff testified that, when the squabble arose with Stinson, he met Reynolds who asked him: "What is the matter with you and Stinson down there; . . . it looks like you people could get along?" Plaintiff then told Reynolds the details and explained to him the merits of the trouble. Thereat Reynolds told him the advance payments had been made by him (Reynolds)—"That is my money in that lumber, I would like to have the lumber." Plaintiff said to him: "All right;" he would as soon let him (Reynolds) have it as the others "if he would take it according to contract." Reynolds then asked what the contract was, and plaintiff told him that he made two propositions to Stinson relating to measurement—one, "inch for inch, or whatever it measured;" the other, "⅞ up for an inch, and under ⅞ for ½ inch." Plaintiff then and there told defendant that Stinson had agreed to take the lumber on "the first proposition,

and to pay for the lumber as fast as it was put aboard the cars, and that he (Reynolds) could take it the same way. I told him Stinson was to give me $11.75, to be paid for when put aboard the cars; he to advance $5 and to pay $6.75 when put aboard the cars. . . . All the rest of the contract, except the measurement of the lumber, remained unchanged with Reynolds . . . and there was to be no certain amount of lumber at all.'' Returning to the matter at a subsequent time in his testimony, the court propounded this inquiry: ''State all the contract between you and Reynolds. A. Well, the contract was made that he was to take the lumber log run, $7/8$ up as an inch and under $7/8$ for half an inch, and to pay for it when it was put aboard the cars *as the other people were.* . . . Q. (By Mr. Collins): And there in the contract was it said about whose property it was until it was paid for? A. Of course, it was mine.'' Thereupon, according to plaintiff's testimony, Reynolds agreed to take the lumber on the second proposition, to-wit, $7/8$ and up for an inch, and under $7/8$ for $1/2$ inch, the other terms of the new arrangement remaining as in the old. The terms of measurement were then written in a little book, reading as follows: ''All over $7/8$ goes for 1; all under $7/8$ for $1/2$ inch.''

Stinson's deposition was taken and read by defendant. That deposition in substance begins with the affair (as to details) after Reynolds got into it. He does not deny that propositions passed between him as the representative of Houston Brothers and plaintiff, and that he (Stinson) accepted one of these propositions on behalf of Houston Brothers; nor does he undertake to testify in regard to the terms of the contemplated deal as it stood originally between him and plaintiff. He dismisses the original deal by planting himself on the theory that it was declared off by Houston Brothers. He says ''Houston Brothers had been advised of the pending deal and wired me to make no ad-

vance on lumber or stick in country," and that he so told plaintiff. The only just conclusion to draw from his testimony is that Houston Brothers withdrew after the arrangement was made and at the time when an advancement was demanded. So that, Stinson's testimony throws no light on the precise terms of the original agreement, nor was he asked to state the terms "of the pending deal," as he puts it. However, he did testify on cross-examination to the terms of the contract between plaintiff and defendant, as follows: "In the agreement with Mr. Coleman, Mr. Reynolds was to pay him $11.75 f. o. b. at loading point; there was a stipulated advance payment, I think, of $5 per 1,000, *the balance due when stack was loaded*"—the word "stack" referring to lumber piles in the mill yard.

The defendant took the stand on his own behalf and testified, in substance, that knowing Stinson represented Houston Brothers and was negotiating for the Coleman lumber and that the deal was off, he bought the lumber himself through Stinson. He subsequently made the advance payments referred to in person and at the end of these payments took a receipt, writing it himself and handing it to Coleman for his signature. This receipt runs as follows:

"Recd. of S. P. Reynolds for Reynolds & Crews, the sum of 1,746 and no-100 as first payment for 349,-200 feet of cottonwood lumber bought of me, H. P. Coleman, by H. Stinson, representing Houston Brothers of Cairo, *the lumber to be delivered in accordance with the trade made with Stinson.*

"H. P. COLEMAN."

It will be seen that this written memorandum unquestionably refers to the deal between Stinson, acting for Houston Brothers, and plaintiff, and recognizes that the delivery of the lumber was to be made in accordance therewith.

We have read and weighed painstakingly every

line of defendant's testimony and can find nothing con-
tradicting the testimony of plaintiff relating to the
terms of the original agreement pertaining to delivery,
title or possession. He says he talked with Coleman
but he does not pretend to give the terms of the conver-
sation. He sums it up as follows: "When we were
talking on the crossing. there I agreed to take it like
he says he wanted Stinson to take it." In his cross-
examination he states as follows: "In my examina-
tion in chief I said I didn't remember the exact words
between us, but I tried to remember the general tenor
of the conversation."

The case then may proceed on the theory that
plaintiff's version of the terms of the original contract
stands practically confessed, because the force of de-
fendant's testimony was leveled at establishing the fact
that he (Reynolds) and not Houston Brothers pur-
chased the lumber under the new arrangement, that
Coleman was fully advised of that fact, and that no
substantial grounds for rescission were laid. Nowhere
else in the record is there any contradiction of the fact
that the terms of the trade were cash on delivery on
board the cars, and that the lumber remained plain-
tiff's until paid for. To the contrary, there is by in-
direction and inference cogent testimony, unchallenged,
sustaining plaintiff's theory of the terms of the agree-
ments with Stinson and Reynolds.

It seems that Stinson not only represented Hous-
ton Brothers, but in certain particulars acted for Rey-
nolds. One of them was that after Reynolds took Hous-
ton Brothers' place and agreed to make the advance
payments he (Stinson) caused a brand, to-wit, "S. P.
R.," to be put on certain stacks of lumber in plaintiff's
mill yard, which brand was the initials of defendant's
name. Coleman says this brand was put there to show
merely what stacks of lumber were in the deal so that
an estimate could be placed on them for the purpose of

the advance payment. Defendant, himself, ordered Stinson to brand the stacks of lumber and, as we gather, the significance defendant seems to attach to this branding is that it operated by way of segregating his lumber from the mass in the mill yard, and is to be taken as a sort of symbolical delivery whereby he was put in possession. But there is no evidence, direct or inferential, that this branding constituted a delivery or was intended to be taken as and for a delivery. To the contrary, the lumber remained in Coleman's mill yard, in his actual possession, and subject to the contract that he (Coleman) was to put it on board the cars and was to be paid in full when it was so delivered; and no word of testimony squints at the idea that Coleman ever contemplated taking his hand off his lumber until he was paid for it, and, as said, there is no pretense he made any contract requiring him to do so.

Presently Coleman was dissatisfied with Stinson's inspection. Presently Mr. Reynolds sent another agent to inspect and receive the lumber—one Bostick. He measured and received a small part of it, when again plaintiff became dissatisfied with the inspection. He claimed Bostick was not taking it "log run," but was rejecting lumber that should be taken. Thereat plaintiff forbade Bostick to proceed in the way he was doing; and, basing his action on the foregoing and other facts developed in this connection, forbade him to proceed at all and, refusing to go on with the contract, undertook to sell the lumber remaining to one Hurd. Here again there is no dispute in the evidence. It stands unquestioned that by the arrangement with Hurd he was to take the lumber at a slight advance per 1,000 feet (75 cents) and under an oral contract containing the same terms in the Reynolds contract—that is, it was to be placed by plaintiff on board the cars and was to be paid for on delivery, the title and possession to remain in plaintiff until paid for. A bayou ran between

the lumber and the loading switch. The rainy season was about to set in and plaintiff was under a sharp pressure to get the lumber out before the roads became founderous. Being asked in whose possession this lumber remained, plaintiff said: "In my possession all the time. It never was put in Stinson's. I never let any of them take charge of the lumber until I get my full amount of money." Again he was asked whether it was Hurd's lumber after his deal with Hurd. His answer was: "No, sir; Hurd had never received that lumber. The contract between me and Hurd with reference to when the lumber should be his, was that it should be his when put aboard the cars and paid for like the others."

The case went to the jury with the foregoing evidence unimpeached. The record shows without any question that Reynolds had paid for more lumber than was actually delivered to him; that Coleman before suit offered to settle with him and pay back the excess; that Reynolds declined to receive back the money and claimed the lumber. It seems that after plaintiff and Hurd entered into their agreement, a few cars (two, as we see it) were loaded at the loading switch, but the great bulk of the lumber still remained in stacks in plaintiff's mill yard. In this condition of things, without making Coleman a party, Reynolds brought a replevin suit against Hurd, and the sheriff took all the lumber and put it in the possession of Reynolds. Thereupon Coleman brought the present suit, made a recaption, and subsequently paid into court for Reynolds' benefit so much of the $1,746 as remained after deducting the price of the lumber that Reynolds actually got.

On this record there can be no question but what (unless the Hurd replevin suit is in the road) plaintiff was entitled to a peremptory instruction that the jury should find for him. The contract remaining executory, and payment and delivery being concurrent

acts, then, as a matter of law, the title to the lumber and right to possession did not pass in a sale, cash on delivery, until payment was made. The defendant having possessed himself of the lumber wrongfully, and in the very teeth of his contract with plaintiff, the latter was entitled to be placed *in statu quo ante*. [Little v. Page, 44 Mo. 412; Boutell v. Warne, 62 Mo. 350; Bergeman v. Railroad, 104 Mo. 77; Johnson-Brinkman Com. Co. v. Central Bank, 116 Mo. l. c. 570; Bank v. Tiger Tail Mill & Land Co., 152 Mo. 145; Johnston v. Parrott & Barnes, 92 Mo. App. 199.]

Plaintiff did not ask a peremptory instruction, but was given an instruction putting it to the jury to find as a fact whether the contract between plaintiff and defendant was cash on delivery on board cars; and they were told that if they found the contract to be that way, and if they further found that the lumber was not paid for, then their finding should be for plaintiff. If the jury had found against plaintiff under that instruction, it would have been the duty of the court to have set their verdict aside *instanter* on the record presented to us. No such verdict could stand. The jury, however, found for plaintiff, thus doing the only thing they could do, and the very thing the court should have told them to do, without regard to the issue of rescission. Their verdict being right, and a judgment thereon following, it ought not to be reversed because of harmless errors in other instructions addressed to an immaterial issue on rescission. In this view of the case the question of rescission is not reached; and the facts depended upon by plaintiff to show a rescission and a right to a rescission, and the facts depended upon by defendant to show no right to a rescission and no rescission, need not be developed.

III. But it is contended by defendant that the pendency of the prior replevin suit of Reynolds v. Hurd, pleaded in the answer, must be taken into ac-

count. In considering that contention, it may be said that the defendant asked a mandatory instruction that the jury find for him. This instruction was refused and it is sought to predicate error of that refusal. If, therefore, the pendency (if pendency was proved) of the prior replevin suit, as a matter of law, stands in the way of plaintiff's recovery of the possession of his property, then it was error to refuse that instruction. In disposing of this insistence it is proper to say in passing that there was no competent evidence of the bringing of a former suit or of its pendency. The pleadings, writ and return in that case were not introduced, nor was there any proof, worthy of the name, showing that such suit was still pending or what the issues were. But lay witnesses were allowed to testify that the suit of Reynolds v. Hurd was brought, the writ served and the property taken under it (all, without objection) ; and as the case was tried on the theory that the first replevin suit covered the same property and was seized under a writ therein and turned over to Reynolds, and that the case was pending, we shall treat it as tried on that theory. At the outset it must be observed that this is not a case where chattels were seized under a second writ of replevin while they were in the very hands of the officer of the law and not yet delivered to the plaintiff in the first suit. Nor is this a case where it is shown that the defendant in the first suit had been put into possession of the chattels, as owner, by the plaintiff in the second suit; nor is it a case where Coleman holds any title or right, now at issue, as grantee or donee of Hurd, or in subordination to the title put in question in the first suit. It is a case presenting a simple and single issue, viz.: If A sue B in replevin and get possession of C's lumber under the writ, may C institute his independent suit against A to recover possession of the lumber? Or must C intermeddle in the first suit and abide its intermediate inci-

dents and final event, or postpone the recaption of his lumber until the first suit is out of the way? The question is neither new nor open in this State and the learning thereon need not be restated. On the hypothesis in hand the property was not *in custodia legis* and Coleman was entitled to bring his suit and maintain it. [Coen v. Watkins, 62 Mo. App. 502; Westbay v. Milligan, 74 Mo. App. 179; Mohr v. Langan, 162 Mo. 474; 24 Am. and Eng. Ency. Law (2 Ed.), 503.]

If Reynolds has subjected himself to annoyance in instituting the first suit, or put himself in the way of loss by voluntarily enmeshing himself in entanglements, then he fell into a pit he digged himself, it is his affair and Coleman cannot be hindered or delayed thereby in enforcing his rights to his own property. [Ilsley v. Stubbs, 5 Mass. 280.] If the cause of Reynolds v. Hurd had proceeded to judgment, that judgment would not be *res judicata* as to Coleman, who was no party to it and did not hold in subordination to Hurd's title as his grantee, donee, or otherwise. [Womach v. St. Joseph, 201 Mo. 467.] Therefore, if the judgment would not bind him, so much the less will the mere pendency of the suit bind him or affect his rights. We rule the point against the defendant.

Questions are made here by learned counsel of defendant touching the admission and exclusion of testimony. We find no reversible error in any assignment on that score.

The judgment must be affirmed. All concur.